IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOLAN,<br><br>        Plaintiff,<br><br>  v.<br><br>HEALD COLLEGE ET AL,<br><br>        Defendant.<br>_____/ | No. C05-03399 MJJ<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT AND CLARIFYING PREVIOUS ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

Before the Court is Plaintiff Jeanne Nolan's ("Plaintiff" or "Nolan") Motion to Alter or Amend Judgment.[1] Defendants Heald College ("Heald"), Heald College Long Term Disability Plan (the "Plan"), and Metropolitan Life Insurance Company ("MetLife") (collectively, "Defendants") oppose the motion. For the following reasons, the Court **DENIES** Plaintiff's Motion to Alter or Amend Judgment and clarifies its previous Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment.[2]

**FACTUAL BACKGROUND**

This suit was brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking past and future long term disability ("LTD") benefits under the Plan administered and insured by MetLife. Plaintiff alleges that she is eligible for LTD

---

[1]Docket No. 65.

[2]Docket No. 63.

benefits due to a disabling condition, which has prevented her from working since April 10, 2002. Plaintiff received benefits under the Plan for 24 months, until July 9, 2004. At that point, MetLife terminated her benefits believing that her condition fell within the "neuromusculoskeletal" 24-month limit. Plaintiff twice appealed the termination decision. MetLife denied both of Plaintiff's appeals. Except as otherwise noted, the factual background of Plaintiff's claim history as taken from this Court's Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendants' Motion for Summary Judgment ("Summary Judgment Order") is as follows. (*See* Docket No. 63, *Nolan v. Heald College et al.*, Case No. C05-3399 MJJ.)

**I.     Long-Term Disability Under the Plan**

The Plan provides LTD benefits which are funded through a group policy of insurance issued by MetLife to Heald. (Administrative Record ("MET") 1-59.) The maximum Benefit Duration under the Plan for LTD benefits for employees such as Plaintiff, who were under age 60 at the time they allegedly became disable, is age 65. (MET 12.)

Plan participants are entitled to receive LTD benefits if they are "Disabled" (as that term is defined in the Plan), and they became "Disabled" while covered under the Plan. (MET 17.) The Plan defines "Disabled" in pertinent part as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> (1) during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation form any employer in your Local Economy; or
>
> (2) after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable qualified taking into account your training, education, experience and Predisability Earnings.

(MET 19-20.) The "Elimination Period" for LTD benefits is 90 days of continuous disability. (MET 12, 18.) Monthly LTD benefits under the Plan begin on the date following the day the participant completes the Elimination Period. (MET 17.) Monthly LTD benefits may end for a variety of reasons, such as when the participant is no longer "Disabled," reaches the Maximum Benefits Duration, or fails to provide required information. (MET 17-18.)

2

Certain conditions are subject to limits under the Plan. The maximum benefit period for disability due to Neuromusculoskeletal or Soft Tissue Disorder is 24 months. (MET 14, 32-34.) A "Neuromusculoskeletal or Soft Tissue Disorder" includes any disease or disorder of the spine or extremities and the surrounding soft tissue, including sprains and strains of joints and adjacent muscles. (MET 33.) Exceptions to this limitation include radiculopathies (defined as disease of peripheral nerve roots supported by objective clinical findings of nerve pathology). (MET 33-34.)

**II.      Chronological Summary of Claim**

   **1.      Injury and Payment of Benefits For First 24 Months Under the Plan**

On April 10, 2002, Plaintiff was injured at work when her shoe caught on a plastic mat under her chair and she fell backwards, landing on her back. (MET 330.) Plaintiff consulted Dominic Tse, M.D., an orthopedist, who noted that she was unable to sit but could stand, lean against the wall and walk. (MET 330-331.) Dr. Tse ordered x-rays which revealed a fracture of the left wrist and compression fracture of the lumbar spine. (MET 265, 331.)

On April 17, 2002, one week later, Dr. Tse reevaluated Plaintiff. Dr. Tse recorded that Plaintiff was more comfortable and no longer in acute distress. (MET 262.) Dr. Tse's prognosis was that Plaintiff would be off work for three to four weeks. (*Id.*) On April 23, 2002, Dr. Tse again evaluated Plaintiff and noted that the intensity of Plaintiff's back pain had subsided. (*Id.*)

On May 1, 2002, Dr. Tse evaluated Plaintiff and reported that Plaintiff was "obviously a lot better." (MET 260.) Dr. Tse stated, "She is making good progress and will improve further with time." (*Id.*) During that office visit, Dr. Tse released Plaintiff to return to work on May 6, 2002 with a single work restriction of no lifting over 15 pounds for two weeks, at which point her condition would be reassessed. (MET 260, 344.)

On May 15, 2002, Dr. Tse evaluated Plaintiff and reported that Plaintiff informed him she had been laid off from Heald on May 10, 2002. (MET 258.) Dr. Tse noted that Plaintiff was negotiating with Heald to see if another position would become available. (*Id.*) Dr. Tse stated that Plaintiff would have the same restrictions of no lifting over 15 pounds, and no repetitive bending. (*Id.*)

On June 14, 2002, Dr. Tse provided an update regarding Plaintiff's condition. (MET 257.)

3

1 Dr. Tse noted that Plaintiff does most things while standing rather than sitting, that Plaintiff remains
2 disabled from the full range of usual and customary occupation, and that Plaintiff was released to
3 return to work but with modifications to avoid prolonged sitting. (*Id*.)

4 On June 27, 2002, after failing to secure a new position with Heald, Plaintiff submitted a
5 claim for LTD benefits under the Plan. (MET 123-24.) On Plaintiff's claim form, she stated that her
6 date last worked was April 10, 2002 (the date of the accident), not May 10, 2002 (her actual date last
7 worked). (MET 123.)

8 Subsequently, Dr. Tse submitted an Attending Physician Statement ("APS"), dated July 5,
9 2002, as part of the LTD claim, describing Plaintiff's condition as an acute compression fracture of
10 the lumbar spine and a fracture of the left wrist. (MET 108.) Dr. Tse disclosed that Plaintiff could
11 work eight hours per day with a job modification of avoiding lifting, repetitive bending or prolonged
12 sitting. (MET 109.) Dr. Tse further stated that he expected improvement of Plaintiff's condition in
13 three to six months, and revealed that he advised Plaintiff to return to work as of May 6, 2002, with
14 modifications. (*Id.*)

15 On July 10, 2002, Plaintiff responded to MetLife's request for clarification of the
16 discrepancies between her claim form and Dr. Tse's APS. (MET 315.) Plaintiff explained that she
17 had wanted to return to work; that Dr. Tse reluctantly agreed to allow her to attempt to return to
18 work; that subject to Dr. Tse's limitations, she should not exceed 3 hours work in a day; that after
19 attempting to work on 5 occasions it became clear that she could not perform even light duty; that
20 she cannot work because she is still limited in her movement and experiencing a great deal of pain
21 and discomfort. (*Id*.) Plaintiff did not inform MetLife that she had been laid off from her position or
22 that she had unsuccessfully negotiated to obtain another position.[3] Plaintiff copied Dr. Tse on her
23 clarification letter to MetLife. (MET 315.) Plaintiff also sent Dr. Tse a separate note stating she
24 wanted to make sure MetLife "understood" that she was unable to work. (MET 314.)

25 On July 10, 2002, MetLife commenced Plaintiff's LTD benefits in accordance with the 90-
26 day Elimination Period, which ran from April 10, 2002 (the date Plaintiff claimed to have last

---

28 [3]The record indicates additional discrepancies in Plaintiff's July 10, 2002 clarification. In particular, as of July 10, 2002, there is nothing in the record suggesting that Dr. Tse had restricted Plaintiff to working only three hours per day.

4

1  worked). (MET 152.) Plaintiff later received benefits from Social Security, which Plaintiff offset
2  from her LTD benefits received under the Plan. (MET 137-39, 151, 196.)

3  On July 19, 2002, Dr. Tse issued a letter echoing Plaintiff's representations made in her July
4  10, 2002 clarification letter. (MET 328-29, 335.)[4] Between August 2002 and October 2002,
5  Plaintiff continued to complain of pain (MET 254), continued to have poor sitting tolerance (MET
6  251), and continued to engage in physical therapy (*Id*).

7  On November 21, 2002, Plaintiff received a Functional Capacity Evaluation ("FCE") by Mr.
8  David Pringle ("Pringle"), a physical therapist. (MET 134-35.) Mr. Pringle concluded that Plaintiff
9  could not sit in a sedentary position for more than 8 minutes at a time and that sitting was not
10 suggested for more than 1 hour per day at no greater than 10 minute increments, although Mr.
11 Pringle opined that Plaintiff was capable of engaging in sedentary work. (MET 135, 582, 601)

12 On December 11, 2002, Plaintiff saw Dr. Tse for a review of an MRI of her spine taken on
13 November 26, 2002 and review of Mr. Pringle's FCE. (MET 248.) Dr. Tse noted that Plaintiff
14 could work in a sedentary physical demand level although her sitting tolerance was poor, as noted by
15 Mr. Pringle. (*Id*.) Dr. Tse noted that Plaintiff would be changing her treating physician to Robert
16 Minkowsky, M.D. for future consultation. (*Id*.)

17 On March 23, 2004, MetLife issued a letter to Plaintiff stating that in order for her benefits to
18 continue past July 9, 2004, she had to provide evidence of total disability from any occupation for
19 which she was reasonably qualified. (MET 152-53.) Under the Plan, eligibility benefits change
20 after 24 months from being disabled from the participant's own occupation to being disabled from
21 any gainful occupation for which the participant is reasonably qualified. (MET 19, 152.)

22 On June 16, 2004, MetLife issued a letter notifying Plaintiff that benefits would terminate
23 effective July 9, 2004, in light of a report by Dr. Minkowsky. (MET 171-72.) Specifically, MetLife
24 cited to Dr. Minkowsky's report of May 22, 2003, related to Plaintiff's claim for workers'
25 compensation, where Dr. Minkowsky noted that Plaintiff had improved functionally, pain was
26 intermittent rather than constant, her ability to walk, sit and stand had markedly increased, and that

---

[4] At summary judgment, Defendants argued Dr. Tse's July 19, 2002 letter contradicts his earlier reports on May 1 and May 15, 2002, where Dr. Tse described improvement in Plaintiff's condition and her ability to work subject to certain limitations.

5

1  Plaintiff still had a problem with her spine and musculoskeletal system. (MET 181-82.)
2  MetLife informed Plaintiff that Dr. Minkowsky's diagnoses was subject to the Plan's Limited
3  Benefit Condition. (MET 172.)
4      On August 2, 2004, Plaintiff wrote to MetLife requesting copies of various documents.
5  (MET 173.) On August 5, 2004, MetLife responded, provided documents to Plaintiff, and notified
6  Plaintiff of her appeal rights. (MET 191-92.)
7      On August 6, 2004, Plaintiff returned to Dr. Tse for an examination. (MET 242.) Dr. Tse
8  issued a report supporting Plaintiff's claim. (*Id.*) Dr. Tse noted that he had not seen Plaintiff since
9  December 2002 and that Plaintiff continued to have wide-spread areas of musculoskeletal pain with
10  chronic myofacial pain disorder and cervical radicular involvement into a left upper extremity with
11  cervical radiculopathy. (MET 243.)
12      **2.**     **Plaintiff's First Appeal**
13      On September 10, 2004, Plaintiff appealed the termination of her LTD benefits. (MET 198-
14  200.) Plaintiff advised MetLife that additional information would be needed before she could
15  complete the appeal. (MET 198.) MetLife sent an acknowledgment on September 17, 2004,
16  advising Plaintiff that she had 180 days from the termination of benefits to submit additional
17  information. (MET 201.)
18      On September 20, 2004, Plaintiff saw William W. Anderson, M.D., a neurologist. Dr.
19  Anderson concluded that Plaintiff's "problem in the upper extremities is due to bilateral thoracic
20  outlet syndrome manifested by rib dysfunction, the first rib being superiorly displaced on the right
21  and evidence of rib torsions on the upper ribs on the left side" and that this problem was causing
22  radicular pain. (MET 527-28)
23      On December 13, 2004, Plaintiff sent another appeal letter, with medical records, stating,
24  "We are still awaiting one further medical report, but will submit it as soon as it is received." (MET
25  202-12.) On December 16, 2004, MetLife responded that the 180-day period to submit her appeal
26  was expiring that day, but in light of her request to submit additional information, an extension of 30
27  days would be granted. (MET 367.)
28      On December 17, 2004, Plaintiff sent another report to MetLife that contained Dr. Tse's

6

report and a summary of Plaintiff's medical visits with various doctors. (MET 368-73.) On December 21, 2004, MetLife responded that the additional report had been received and the claim had been referred for an independent medical review. (MET 380.)

MetLife submitted Plaintiff's file to Richard Silver, M.D., an orthopedic surgeon, for a physician medical review. (MET 386-391.) On January 17, 2005, Dr. Silver issued a report opining that Plaintiff

> "is capable of being gainfully employed and has been capable of being gainfully employed for a prolonged period of time dating back to the FCE on 11/21/02, which shows that she could do sedentary gainful employment. . . [Plaintiff] is able to work in a sedentary capacity . . . [T]he medical documentation does not support functional limitations . . . [Plaintiff's] subjective complaints are unsubstantiated by objective clinical findings that would preclude her from working as an administrator in a sedentary capacity . . . [Plaintiff] is capable of working."

(MET 387-88.)

Dr. Silver also opined that the records did not show a condition that fell within one of the exceptions to the Plan's 24-month benefits limitation for neuromusculoskeletal disorders. (MET 389.) "From an orthopedic perspective, [Plaintiff] does not have a radiculopathy . . . and the condition that she is claiming does not support functional limitations from 7/10/04 to the present time." (*Id.*) Dr. Silver also conducted a Physical Capacities Evaluation and found Plaintiff could work with limited restrictions of no lifting over 20 pounds or frequently lifting over ten pounds, among other limitations. (MET 390-391.)

On January 24, 2005, MetLife denied Plaintiff's appeal on two grounds: (1) insufficient evidence of an exception to the 24-month limitation on neuromusculoskeletal disorders, and (2) insufficient evidence of impairment of a severity that would prevent Plaintiff from performing "any occupation." (MET 392-396.) MetLife informed Plaintiff that she had exhausted her administrative remedies under the Plan, that no further appeal would be considered, and that Plaintiff had a right to bring a civil action under ERISA. (MET 396.)

On February 15, 2005, Plaintiff wrote to MetLife contesting the denial of her appeal. (MET 397-98.) Plaintiff argued that denial was improper because the denial added an additional grounds for denial when compared with the original termination letter. (*Id.*) Plaintiff complained that the

7

result was unfair because she had no opportunity to rebut Dr. Silver's findings, and because the full record supported her continued receipt of benefits.  (*Id.*)

MetLife agreed to provide a further appeal review and on February 24, 2005, MetLife issued a letter to Plaintiff's counsel enclosing a copy of the claim file.  (MET 530.)  On March 31, 2005, MetLife notified Plaintiff that even though she was previously informed that she had exhausted her administrative review process, MetLife would nevertheless conduct one further review of her claim.  (MET 531-32.)  MetLife gave Plaintiff until June 10, 2005 to provide any additional information she wished to submit.  (MET 532.)

### 3.     **Plaintiff's Second Appeal**

On June 9, 2005, Plaintiff submitted her second appeal.  (MET 533-536.)  Plaintiff argued that Dr. Silver was wrong in opining that she could hold a sedentary job.  (*Id.*)  Plaintiff submitted additional medical documents and opinions from her own doctors.  (*Id.*)  Subsequently, Plaintiff submitted a July 14, 2005 report from Jeff Malmuth, M.S., a vocational counselor, opining that Plaintiff was not capable of performing sedentary work.  (MET 599-605.)

MetLife submitted Plaintiff's file, including all of Plaintiff's appellate paperwork for a second physician medical review.  James Jares, III, M.D., a neurologist, conducted the review.  (MET 580-89.)  On July 1, 2005, Dr. Jares issued a report in which he opined that Plaintiff "retain[ed] the ability to work full time in a sedentary position with the allowance of reposition as necessary for comfort."  (MET 585.)  Regarding the Plan's 24-month limitation for neuromusculoskeletal disorders, Dr. Jares noted that Plaintiff "has some clinical features consistent with the exclusionary diagnosis [i.e., conditions that are an exception] but these appear to have occurred later in the course of her illness and not at the exact time of her injury in April 2002."  (MET 586.)

MetLife asked Dr. Jares to clarify when Plaintiff had developed a condition that could be within an exception to the 24-month limit.  (MET 608-609.)  On July 25, 2005, Dr. Jares prepared a supplemental report explaining that the opinion at issue was reflected by Dr. Minkowsky on January 27, 2003, and Dr. Tse on August 6, 2004.  (MET 608-09.)  However, Dr. Jares opined, "My conclusions about [P]laintiff's ability to work [that is, that she was able to work] have not changed."

8

(*Id.*)

MetLife asked Dr. Jares for further clarification. Dr. Jares prepared another report dated August 10, 2005. (MET 611-12.) Dr. Jares stated, "Upon review, the L1 compression fracture that [Plaintiff] experienced in April 2002 does not fall into one of the listed exclusionary categories." (MET 612.) Dr. Jares did note that cervical radiculopathy was present prior to July 10, 2004, based upon Dr. Tse's earlier findings. (*Id.*)

On September 19, 2005, MetLife issued a letter to Plaintiff denying her second appeal.[5] (MET 613-15.) Regarding Plaintiff's diagnosis of radiculopathy, the letter reads,

> We have completed our review of the termination of [Plaintiff's] claim for disability benefits. Based on our review of the available information, it has been determined that [Plaintiff] as [sic] been diagnosed with one of the exclusions in the limited benefit condition of the Plan. It has been concluded that [Plaintiff] does have been [sic] diagnosed with radiculopathy and does have a condition that is noted as one of the exclusions of the plan. . . . Review of the information that has been submitted on appeal, along with the information on record, does support that [Plaintiff] has been diagnosed with one of the exclusions in the limited benefit condition of the Plan.

(MET 613-614.) Regarding Plaintiff's ability to perform her own occupation, the letter reads that

> it has been determined that the medical information does not support a severity of impairment that would prevent [Plaintiff] from performing her own job. . . . Review of the information on file is also insufficient to support a severity of functional impairment that would prevent [Plaintiff] from working in a sedentary capacity. Therefore [Plaintiff] can not be considered disabled as defined by [the Plan] and no further benefits are payable.

(*Id.*) The letter noted that a physician consultant, board certified in neurology, reviewed the entire claim file and determined "that from a neurological perspective, the medical records support that [Plaintiff] retains the ability to work full time in a sedentary position with the ability to reposition as necessary for comfort." (MET 614.) The letter further indicated that another physician consultant, board certified in orthopedic surgery, similarly determined that Plaintiff "has no loss of functionality in any aspect of the cervical thoracic, lumbrosacral spine, or of the entire vertebral spine. The consultant notes that [Plaintiff] is capable of working in a sedentary capacity." (*Id.*)

**PROCEDURAL HISTORY**

---

[5]As more fully explained below, the Court incorrectly cited to the contents of the September 19, 2005 letter in the Summary Judgment Order.

9

1    On September 12, 2006, the parties filed cross motions for summary judgment. The parties 2 filed over 1000 pages of administrative record in support of their motions. The administrative 3 record consisted primarily of claims history, medical records, and correspondence. On November 4 14, 2006, after consideration of the pleadings, the administrative record, and the arguments of 5 counsel, this Court denied Plaintiff's motion for summary judgment and granted Defendants' motion 6 for summary judgment. (*See id*.) Plaintiff's now seek reconsideration of the Court's grant of 7 summary judgment.

## LEGAL STANDARD

9    A district court may reconsider its grant of summary judgment under either Federal Rule of 10 Civil Procedure 59(e) (motion to alter or amend a judgment) or Rule 60(b) (relief from judgment). 11 *School Dist. No. 1 J v. ACandS, Inc*., 5 F.3d 1255, 1263 (9th Cir.1993), *cert. denied*, 512 U.S. 1236 12 (1994). While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule 13 offers an "extraordinary remedy, to be used sparingly in the interests of finality and conservation of 14 judicial resources." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (citing Carroll 12 James 15 Wm. Moore et al., *Moore's Federal Practice* § 59.30[4] (3d ed. 2000)). Indeed, "a motion for 16 reconsideration should not be granted, absent highly unusual circumstances, unless the district court 17 is presented with newly discovered evidence, committed clear error, or if there is an intervening 18 change in the controlling law." *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th 19 Cir. 2000) (citations omitted). A Rule 59(e) motion may not be used to raise arguments or present 20 evidence for the first time when they could reasonably have been raised earlier in the litigation. *Id*.

21    The Ninth Circuit has identified three reasons sufficient to warrant a court's reconsideration 22 of a prior order: (1) an intervening change in controlling law; (2) the discovery of new evidence not 23 previously available; and (3) the need to correct clear or manifest error in law or fact, to prevent 24 manifest injustice. *ACandS, Inc*., 5 F.3d at 1263. Upon demonstration of one of these three 25 grounds, the movant must then come forward with "facts or law of a strongly convincing nature to 26 induce the court to reverse its prior decision." *Donaldson v. Liberty Mut. Ins. Co.*, 947 F. Supp. 429, 27 430 (D. Haw. 1996). Whatever may be the purpose of Rule 59(e) it should not be supposed that it is 28 intended to give an unhappy litigant one additional chance to sway the judge. *Illinois Central Gulf*

10

1 *Railroad Company v. Tabor Grain Company*, 488 F. Supp. 110, 122 (N.D. Ill. 1980) (a rehash of the
2 arguments previously presented affords no basis for a revision of the court's order).

## ANALYSIS

**I.      Summary Judgment**

In deciding the parties' cross motions for summary judgment, this Court found that the proper standard of review was abuse of discretion because the Plan unequivocally conferred discretion on MetLife to determine eligibility benefits and to construe the terms on the Plan. (Summary Judgment Order, 12:13-13:1.) Recognizing that MetLife acted as both the Plan administrator and funding source, this Court reviewed the case "tempered by skepticism commensurate with the plan administrator's conflict of interest," as the Ninth Circuit has instructed. *Abatie*, 458 F.3d at 959.

In making its determination, this Court found that MetLife's decision to grant LTD benefits to Plaintiff during the initial 24-month period belied Plaintiff's contention that the decision-making process was tainted by a conflict of interest. (Summary Judgment Order, 16:2-14.) The Court also noted that MetLife agreed to pay LTD benefits to Plaintiff despite the fact that Plaintiff's own doctor had initially found her able to return to work, and that MetLife afforded Plaintiff a second appeal despite the fact that neither ERISA or the Plan required MetLife to do so. (*Id*.) As a result, the Court did not find evidence of a conflict of interest that effected the decision-making process.

Next, this Court determined that MetLife's benefit determinations were not inconsistent. This Court stated, "[a]s a result of the Plaintiff's subsequent appeals and her efforts to generate evidence for continued benefits, MetLife considered new evidence and determined that Plaintiff was not functionally impaired from performing her job and that her medical records did not show the existence of any diagnosis that would be an exclusion to the 24-month limitation for Plan benefits." (*Id*. at 17:1-5.)

Lastly, in concluding that MetLife did not abuse its discretion in terminating and denying Plaintiff's LTD benefits, the Court made two findings. First, regarding the exception to the 24-month limitation under the Plan, the Court found that MetLife did not abuse its discretion in determining that Plaintiff did not suffer from radiculopathy. (*Id*. at 17:8-20:16.) Second, regarding

11

1  Plaintiff's "disability" under the Plan, the Court found that MetLife did not abuse its discretion in
2  determining that Plaintiff was able to return to work and earn 60% of her disposable income. (*Id*. at
3  20:17-23:14.) Accordingly, the Court stated, "[a]s a result of MetLife's review and consideration of
4  the entire record, the Court finds that MetLife's decision to terminate and subsequently deny
5  Plaintiff's LTD benefits was not arbitrary and capricious." (*Id*. at 23:12-14.)

6  In the current motion, Plaintiff argues that the Court erred in fact and law by: (1) finding that
7  MetLife determined that Plaintiff did not suffer from radiculopathy; and (2) failing to conduct the
8  analysis and make findings as required by *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th
9  Cir. 2006). Defendants counter and insist that the Court did not commit error in its factual findings
10 or legal analysis. The Court now turns to Plaintiff's arguments on reconsideration.

11 **I.    Factual Error - Radiculopathy**

12 Plaintiff points to MetLife's denial letter of September 19, 2005 as evidence that the Court
13 factually erred in finding that MetLife determined that Plaintiff did not suffer from radiculopathy.
14 (MET 613-615.) Plaintiff insists that MetLife's denial letter of September 19, 2005 terminated
15 benefits solely on the ground that MetLife determined that Plaintiff was able to perform her own job
16 and was therefore not disabled under the Plan. Pointing to the Court's alleged error, Plaintiff argues
17 that MetLife was therefore inconsistent in paying benefits to Plaintiff for the first 24 months, thereby
18 not disputing that Plaintiff could not perform her own job, and then later terminating benefits on
19 grounds that Plaintiff could perform her own job. Plaintiff contends that termination of LTD
20 benefits was improper because the record was not supplemented by any new evidence demonstrating
21 that Plaintiff's ability to perform her job had improved after 2004. In opposition, Defendants argue
22 that regardless of whether Plaintiff had radiculopathy, MetLife determined that Plaintiff was not
23 functionally impaired from working in her own occupation and therefore termination of LTD
24 benefits was appropriate. (MET 614.) Defendants also contend that the Court was correct in finding
25 that MetLife did not abuse its discretion in determining that Plaintiff was not disabled under the
26 Plan.

27 A review of the administrative record reveals that the Court erred in its Summary Judgment
28 Order. In particular the Court erred in finding that MetLife ultimately determined that Plaintiff did

12

not suffer from radiculopathy. (Summary Judgment Order at 9:25.) As indicated by MetLife's September 19, 2005 letter to Plaintiff, MetLife ultimately denied LTD benefits not because MetLife had determined that Plaintiff did not have radiculopathy, but instead because MetLife determined that Plaintiff was capable of performing her own job and was therefore not "disabled" under the Plan. (MET 613-614.) Additionally, MetLife's Appeal Unit's records support Plaintiff's contention that the Court erred here. Specifically, the Appeal Unit's records indicate that a "[r]eview of the claim file supports that [Plaintiff] has radiculopathy supported by objective evidence . . . Claim unit needs to determine if medical information submitted supports a disability." (MET 645.) Here, having found that the Court erred regarding MetLife's determination on Plaintiff's radiculopathy, the issue now becomes whether the Court's other finding, regarding MetLife's determination on Plaintiff's "disability," is sound.

The Court concludes that its previous finding, that MetLife did not abuse its discretion in determining that Plaintiff was able to return to work, is correct and supported by the record. The definition of "Disabled" under the Plan changed after the first 24-month period. The Plan reads, "Disabled" in pertinent part as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> (1) during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation from any employer in your Local Economy; or
>
> (2) after the 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable qualified taking into account your training, education, experience and Predisability Earnings.

(MET 19-20.) As the record indicates, MetLife sought additional medical evidence of ongoing disability prior to the expiration of the initial 24-month period. MetLife based its request on the fact that the Plan's disability definition changed after the initial 24-month period and the express language of the Plan, indicating that Plaintiff's benefits may be denied if she failed to provide satisfactory documents within 60 days of the request. (MET 5, 40.) "Under the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the

13

1 satisfaction of the insurance company." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985 (6th
2 Cir. 1991).  After the initial 24-month period, MetLife determined that Plaintiff was able to earn at
3 least 60% of her predisability earnings at "any gainful occupation" for which Plaintiff was qualified
4 to take.  Despite the existence of differing medical opinions, MetLife's determination was supported
5 by the record and was therefore not arbitrary and capricious.  (Summary Judgment Order at 21:4-6.)

6       A review of the record demonstrates that there was ample evidence for MetLife to ultimately
7 determine that Plaintiff was able to return to work and therefore was not "disabled" under the Plan.
8 Admittedly, the record indicates that Mr. Malmuth and Plaintiff's own doctors concluded that
9 Plaintiff was not able to engage in sedentary work.  In contrast, Mr. Pringle, Dr. Jares, and Dr. Silver
10 concluded that Plaintiff was able to engage in sedentary work.  Dr. Jares and Dr. Silver considered
11 the relevant record and relied on their own Physical Capacities Evaluation and found Plaintiff could
12 work with limited restrictions.  (MET 390-91.)  Nothing in the record suggests that MetLife or
13 MetLife's reviewing professionals, ignored Plaintiff's complaints or the conclusions and diagnoses
14 of Plaintiff's treating physicians.  Instead, Met Life's professionals found Plaintiff's evidence to be
15 either unsubstantiated by objective medical evidence or found that the evidence was not sufficient to
16 justify continuation of LTD benefits.  As a result of MetLife's review and consideration of the entire
17 record, the Court finds that MetLife's decision to deny Plaintiff's LTD benefits on grounds that she
18 not "disabled" under the Plan was not arbitrary and capricious.  The Court further finds that its
19 previous error regarding MetLife's determination that Plaintiff did not suffer from radiculopathy
20 does not effect the outcome of the final judgment and was therefore harmless.

21 **II.    Legal Error**

22       Plaintiff argues that the Court legally erred by failing to apply the analytical process
23 required by *Abatie*.  In particular, Plaintiff avers that the Court erred in: (1) treating the cross-
24 motions for summary judgment as motions for summary judgment, rather than for judgment on the
25 administrative record under Federal Rule of Civil Procedure 52(a); (2) failing to make a
26 determination between competing expert opinions; (3) failing to analyze the independence and the
27 alleged conflict of interest between MetLife and its reviewing physicians.  (Plaintiff's Motion to
28 Alter or Amend Judgment ("Mot.") at 5:8-23.)  The Court will address Plaintiff's contentions in

14

turn.

### A.  Bench Trial

Plaintiff argues that under an "arbitrary and capricious" review *Abatie* requires courts to conduct a bench trial under Rule 52(a) when there is conflicting evidence in the record. (Mot. at 5:26-6:2.)  The Court disagrees with Plaintiff's interpretation of *Abatie*.  *Abatie* but does mandate a bench trial in the face of conflicting evidence in the record, but instead instructs that when a court does conduct a bench trial, the court must make findings of fact on all contested issues and issue a ruling under Rule 52 which is sufficiently explicit to give the appellate court an understanding of the basis for the court's decision. *Abatie*, 459 F.3d at 973 (citation omitted).  Here, the Court did not conduct a bench trial and therefore was not required to make findings under Rule 52 as Plaintiff contends.

### B.  Competing Expert Opinions

Plaintiff argues that the Court improperly followed non-Ninth Circuit authority in refusing to make a credibility determination between competing expert opinions.  Plaintiff's argument misinterprets the Court's inquiry under an abuse of discretion standard of review as set forth in *Abatie*. *Abatie*, 459 F.3d at 968-69.  Under *Abatie*, as more fully explained below, the Court considered the conflicting evidence in determining the appropriate weight to give the structural conflict of interest that was present on this record. *Id*. at 970.  Plaintiff fails to provide the Court with authority permitting the Court to make credibility determinations between competing expert opinions when reviewing a denial of benefits under an arbitrary and capricious review. *Compare Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 814 (7th Cir. 2006) (finding that plan administrator's physician's reports demonstrated a thorough consideration of available information to support finding of disqualification from LTD coverage and although claimant's treating physicians reached different conclusions, under an arbitrary and capricious review, the court will not attempt to make a determination between competing expert opinions.)  Accordingly, the Court finds Plaintiff's argument here unavailing.

### C.  Conflict of Interest

Plaintiff's remaining contentions are that the Court erred in placing the burden on Plaintiff to

15

affirmatively show "misconduct" in order to establish a conflict of interest, that the Court improperly deferred to MetLife's physician reviewers' opinions despite conflicting evidence from Plaintiff's physicians, and that the Court erred in failing to analyze the "independence" of MetLife's physician medical reviewers.  Defendants respond that the Court properly considered and evaluated the alleged conflict of interest and correctly determined that there was no abuse of discretion.

*Abatie* establishes the abuse of discretion approach to ERISA cases in which a conflict of interest exists.  *Abatie* 458 F.3d at 955.  When reviewing to determine whether an abuse of discretion has occurred, the proper review is one "tempered by skepticism commensurate with the plan administrator's conflict of interest."  *Id*.  Such a review requires a case by case balance weighing the conflict of interest as a factor in the abuse of discretion review.  *Id*. at 968.  In Abatie, the court stated,

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id*. at 968 (citing *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc*., 125 F.3d 794, 799 (9th Cir. 1997), *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463-64 (9th Cir.1997); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Unlike de novo review, review for an abuse of discretion is generally limited to the administrative record before the plan administrator at the time of its decision.  *Id*. at 970.  However, a court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.  *Id*. (citing *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999)).

Here, the Court properly weighed MetLife's structural conflict of interest and the independence of its physician medical reviewers.  Contrary to Plaintiff's contention, the Court did not place the burden on Plaintiff to show "misconduct" in order to establish a conflict of interest and

16

1 a less deferential standard of review. To the extent Plaintiff's interpreted the Court's Summary
2 Judgment Order as placing the burden on them, the Court clarifies that the Order was merely
3 recognizing that there was no evidence of "misconduct" by MetLife in the record, offered by
4 Plaintiff or otherwise. The Court did not intend to imply that Plaintiff had an affirmative duty to
5 produce such evidence. *See Abatie*, 458 F.3d at 967. Furthermore, the Court notes that the record is
6 absent of any "material probative evidence" tending to show that MetLife's conflict of interest
7 caused a breach of its fiduciary obligations to Plaintiff. *Id.* at 966. Rather, the record contains
8 affirmative evidence which demonstrates that MetLife did not breach its fiduciary obligations. For
9 example, as set forth in the Summary Judgment Order, MetLife afforded Plaintiff two opportunities
10 to appeal the termination of her LTD benefits, and also granted Plaintiff benefits for the initial 24-
11 month period despite contradictory reports from her own physician initially indicating that Plaintiff
12 could return to work for 8 hours per day with minor restrictions. Rather than deny Plaintiff's claim
13 due to her doctor's diagnosis, MetLife sought clarification and considered a revised and somewhat
14 contradictory report from Plaintiff's doctor. The Court further notes that MetLife granted Plaintiff
15 extensions of time to augment her appellate submissions.

16 Regarding MetLife's physician reviewers' independence, the Court considered evidence
17 offered by both parties. In support of Plaintiff's argument that the reviewers were biased, the Court
18 considered extrinsic evidence showing the number of MetLife file reviews completed by Dr. Silver
19 and Dr. Jares, the amount of compensation they received from MetLife, and their retention through
20 Network Medical Review ("NMR"). In contrast, and in support of the physician reviewer's
21 independence, the Court examined the substance of the actual file reviews. As explained previously,
22 both Dr. Jares and Dr. Silver reviewed Plaintiff's voluminous medical history containing opinions
23 from each of Plaintiff's doctors, including evidence that one of Plaintiff's doctors had offered
24 conflicting opinions about her ability to work after the accident. Dr. Jares and Dr. Silver considered
25 the records and competing opinions and relied on their own Physical Capacities Evaluation[6] and

---

[6] In her motion, Plaintiff incorrectly states, "The Court apparently assumed that Dr. Silver and Dr. Jares conducted some sort of physical examination or testing of Plaintiff, but his is incorrect." In clarification of the Summary Judgment Order, the Court was aware that Dr. Jares and Dr. Silver conducted Physical Capacity Reviews in reliance on Plaintiff's medical records and assigned weight to those reviews accordingly.

17

found Plaintiff could work with limited restrictions. The medical records indicated that Plaintiff's own doctors had diagnosed Plaintiff as having a condition that would improve over time and they remained optimistic she would eventually return to work. "[I]t is not the case that every time a plan administrator discontinues disability benefits, it must produce evidence of medical improvement." *Lawrence v. Motorola, Inc*., 2006 WL 2460921 at *9 (D. Ariz. 2006). As a result of MetLife's review and consideration of the entire record, the Court finds that MetLife's decision to deny Plaintiff's LTD benefits was not arbitrary and capricious. Therefore, the Court **DENIES** Plaintiff's Motion to Alter or Amend Judgment.

## CONCLUSION

For the foregoing reasons, the Court finds **DENIES** Plaintiff's Motion to Alter or Amend Judgment and clarifies its Summary Judgment Order as set forth above.

**IT IS SO ORDERED.**

Dated: March 19, 2007

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE